UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - x
                                  :
UNITED STATES OF AMERICA          :     **SEALED INDICTMENT**
                                  :
       - v. -                     :     S2 15 Cr. 536
                                  :
ROBIN SMYTH,                      :
                                  :
       Defendant.                 :
                                  :
- - - - - - - - - - - - - - - - x

ORIGINAL

## COUNT ONE

(Conspiracy To Commit Securities Fraud, Make False Statements In Annual And Quarterly SEC Reports And Make False Statements To Auditors)

The Grand Jury charges:

### RELEVANT PERSONS AND ENTITIES

1. At all times relevant to this Indictment, KIT digital, Inc. ("KITD") was a provider of end-to-end video asset management software and related services, with a focus on Internet Protocol-based interactive media, headquartered in Prague, Czech Republic and New York, New York.

2. From in or about May 2008 to on or about August 12, 2009, KITD's common stock was traded on the OTC Bulletin Board, which is an electronic quotation system for over-the-counter securities that are not listed on a national securities exchange. Beginning on or about August 13, 2009, KITD's common stock was traded on the NASDAQ.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/12/15

3. At all times relevant to this Indictment, ROBIN SMYTH, the defendant, was the Chief Financial Officer ("CFO") of KITD. At all times relevant to this Indictment, SMYTH signed the quarterly and annual financial statements that KITD filed with the SEC.

4. At all times relevant to this Indictment, a co-conspirator not named as a defendant herein ("CC-1") was the Chairman of the Board of Directors and Chief Executive Officer ("CEO") of KITD. At all times relevant to this Indictment, CC-1 signed the quarterly and annual financial statements that KITD filed with the United States Securities and Exchange Commission (the "SEC").

5. At all times relevant to this Indictment, The Country Network ("TCN") was a digital multicast network that specialized in broadcasting country music videos.

6. At all times relevant to this Indictment, Sezmi Corporation ("Sezmi") was a cloud-based video delivery platform company that helped television providers deliver content over Internet Protocol connected devices.

7. From at least in or about 2007 up to in or about September 2009, KITD employed Accounting Firm-1 as an independent auditor. Accounting Firm-1 performed year-end audits of KITD's financial statements and quarterly reviews of selected KITD financial information. Thereafter, from in or

about October 2009 up to in or about 2012, KITD employed Accounting Firm-2 as an independent auditor. Like Accounting Firm-1, Accounting Firm-2 performed year-end audits of KITD's financial statements and quarterly reviews of selected KITD financial information.

## CERTAIN RELEVANT ACCOUNTING PRINCIPLES AND PUBLIC COMPANY REPORTING REQUIREMENTS

8. At all times relevant to this Indictment, KITD was required to comply with the federal securities laws, which are designed to ensure that a company's financial information is accurately recorded and disclosed to the public. Specifically, at all times relevant to this Indictment, pursuant to the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, KITD was required to: (a) file with the SEC annual financial statements (on SEC Form 10-K) that had been audited by independent certified public accountants; (b) file with the SEC quarterly financial reports (on SEC Form 10-Q); and (c) make and keep books, records and accounts that accurately and fairly reflected KITD's business transactions.

9. At all times relevant to this Indictment, KITD provided members of the investing public with information concerning KITD's anticipated and actual financial results. KITD provided such information through various methods, including public filings with the SEC, periodic news releases

and other corporate announcements, statements made in conference calls with professional securities analysts and investors, and meetings and conferences held with investors. Investors considered the information provided by KITD in deciding whether to purchase, hold, or sell KITD securities.

10. KITD's public filings with the SEC included financial statements which contained, among other things, an Income Statement and a Balance Sheet. A company's Income Statement reports, among other things, revenue recognized, expenses incurred, and net income earned during a stated period of time, usually a fiscal quarter or a fiscal year. Within an Income Statement, expenses are subtracted from revenue to calculate net income. A company's Balance Sheet reports the company's assets, liabilities, and shareholder equity as of a specific date.

11. At all times relevant to this Indictment, ROBIN SMYTH, the defendant, CC-1, and others, participated in the process of communicating KITD's financial condition to the investing public by (a) signing and certifying the accuracy of KITD's filings with the SEC, (b) speaking at meetings, conferences, and conference calls with securities analysts and investors, and (c) providing and reviewing information that was included in KITD's financial results, reports, and public disclosures.

12. At all times relevant to this Indictment, KITD's quarterly and annual financial statements were transmitted to

the New York, New York offices of Vintage Filings ("Vintage"), a filing agent that assisted companies in electronically filing periodic reports with the SEC, and were thereafter transmitted electronically by Vintage to the SEC for filing.

## BACKGROUND

13. Between in or about 2008, when CC-1 became Chairman and CEO of KITD, and in or about the spring of 2012, when CC-1 resigned his positions at KITD, KITD, like many start-up technology companies, never reported a profitable year in its annual financial statements. Under CC-1's leadership, however, KITD touted itself to the investing public as a growing company that routinely met or exceeded the so-called "guidance" that CC-1 and other KITD executives communicated to the investing public concerning KITD's operational and financial results for upcoming reporting periods. However, as set forth more fully below, ROBIN SMYTH, the defendant, and CC-1 used various false and deceptive means to misrepresent KITD's true financial health to its shareholders and the investing public.

14. On or about November 21, 2012, after an internal investigation led by KITD's audit committee, KITD filed a Form 8-K, which is a report that public companies must file with the SEC to announce major events that shareholders should know about. In the Form 8-K, KITD announced to the investing public that KITD had discovered various errors and irregularities in

its historical financial statements and that it would have to issue restated financial statements. On the first trading day following this announcement, the price of KITD's common stock plummeted more than 64% from the previous day's closing price. In or about December 2012, KITD's stock was delisted from NASDAQ. KITD subsequently declared bankruptcy.

**THE SCHEME TO DEFRAUD**

15. As set forth more fully below, from at least in or about 2010 through in or about 2012, ROBIN SMYTH, the defendant, and CC-1, with others, engaged in an illegal scheme to deceive KITD shareholders, members of the investing public, KITD's independent auditors and others concerning KITD's true operating performance and financial results. In furtherance of the scheme, SMYTH, CC-1, and their co-conspirators: (a) made and caused KITD to make statements to the public, its independent auditors and others which falsely described KITD's revenues, expenses and other financial results and omitted to disclose material facts necessary to make the statements made about KITD's financial results complete, accurate, and not misleading; and (b) caused KITD to file financial statements with the SEC that presented a materially false and misleading description of KITD's operating performance and financial results.

16. At various times relevant to this Indictment, ROBIN SMYTH, the defendant, and CC-1, with others, devised and

6

executed a scheme to inflate falsely KITD's revenue. This scheme involved two principal methods: (a) the improper recognition of revenue from so-called "perpetual license" contracts for KITD software (contracts that gave the purchasing customer the right to use the licensed software indefinitely), and (b) the execution of fraudulent "round-trip" transactions which had the effect of using KITD's own cash, rather than payments received from customers, to pay off bills, known as accounts receivable, that were due and owed to KITD from those customers, rather than disclose to KITD's auditors and the investing public the fact that the bills were uncollectible.

17. With regard to the first method, ROBIN SMYTH, the defendant, and CC-1 knew that KITD had sold perpetual licenses for software that, at the time of sale, was not complete and required substantial future development. But instead of booking revenue ratably as KITD reached interim development milestones or recognizing revenue in full once software development was complete, SMYTH and CC-1 caused KITD to recognize the entirety of the revenue from certain contracts at the time of sale despite the fact that KITD had not delivered a product to KITD's customers. This premature revenue recognition violated relevant software accounting principles and was contrary to KITD's statements to the investing public and its independent auditors, among others.

18. With regard to the second method, ROBIN SMYTH, the defendant, and CC-1, on at least one occasion, caused KITD to use company money, ostensibly escrowed in connection with a KITD corporate acquisition, to pay off suspicious or uncollectible receivables by year-end. Specifically, SMYTH and CC-1 caused KITD to add an artificial "restructuring fee" to the purchase price of certain companies that KITD sought to acquire. Once the purchase price was raised, SMYTH and CC-1 established an escrow account that was funded with KITD cash which purported to represent the so-called restructuring fee. The use of the escrowed KITD money was governed by a "side letter" between KITD and the acquired company that SMYTH and CC-1 created but that both men intentionally hid from KITD's independent auditors and the investing public. The side letter dictated that escrowed funds could be used only to cover the costs KITD expected to incur from integrating the acquired company into KITD. However, as more fully described below, on at least one occasion, SMYTH and CC-1 used the escrowed money in a round-trip transaction that resulted in KITD using its own cash to pay down old receivables that, because of their age, might have attracted scrutiny from KITD's independent auditors and could have negatively impacted KITD's financial statements if they had remained unpaid.

## THE DEFENDANT ARTIFICIALLY INFLATES KITD REVENUE

19. From at least in or about 2010 up to in or about 2012, KITD improperly recognized revenue from certain perpetual licenses for software that had not been delivered to customers. This fraudulent practice of recognizing revenue caused KITD to materially overstate its reported revenue, which had the effect of materially overstating KITD's net income and earnings on its annual and quarterly financial reports issued from the fiscal quarter ending June 30, 2010 through the fiscal quarter ending March 31, 2012.

20. In each of its annual Form 10-K filings, KITD disclosed to members of the investing public that it followed a revenue recognition policy that required four basic criteria to be met in order for revenue to be recognized. Specifically, KITD disclosed that it counted revenue on its books and records when (a) there is persuasive evidence that an arrangement exists; (b) the price is fixed or determinable; (c) collectability is reasonably assured; and (d) product delivery has occurred or services have been rendered. Pursuant to KITD's disclosures, therefore, revenue was not to be recognized when KITD had not in fact delivered a product to a client.

21. As set forth below, on at least two occasions, ROBIN SMYTH, the defendant, and CC-1, with others, recognized revenue for products that KITD had failed to deliver to its clients.

9

SMYTH and CC-1 also worked together to conceal their improper revenue recognition from KITD's independent auditors.

### The Country Network Contract

22. In approximately August 2010, KITD entered into an agreement with TCN to provide TCN with a product that KITD referred to as "VX Manager" or "VX Enterprise" (hereinafter, "VX Manager"). The total contract value was approximately $1,488,000, which consisted of a $1,338,000 perpetual license fee for KITD software and $150,000 for setup fees. A KITD sales representative ("Employee-1") pitched the VX Manager as a groundbreaking technological innovation that would allow TCN to stream video content on various platforms, including mobile devices.

23. On or about June 25, 2010, Employee-1 sent the TCN CEO a KITD proposal dated June 20, 2010 (the "June 20, 2010 Proposal") for VX Manager. Critically, the June 20, 2010 Proposal set forth a "deployment timeline" in which KITD promised to provide TCN with certain components of VX Manager starting in August 2010 and ending in April 2011.

24. Despite this deployment timeline, ROBIN SMYTH, the defendant, caused KITD to record approximately $1,338,000 of revenue -- the entirety of the perpetual license fee from the TCN contract -- during the fiscal quarter ending June 30, 2010. To aid this fraudulent scheme, among other things, on or about

August 9, 2010, SMYTH directed Employee-1 to ask the TCN CEO to confirm falsely and in writing that KITD had delivered VX Manager to TCN on June 22, 2010. Employee-1 complied with SMYTH's instruction, and the TCN CEO subsequently signed the false confirmation. As SMYTH well knew at the time, this revenue recognition was improper for three principal reasons: First, as of June 30, 2010, KITD and TCN had not finalized a contract to purchase VX Manager. Second, as of June 30, 2010, KITD had not delivered VX Manager to TCN. Third, as the June 20, 2010 Proposal illustrated on its face, the VX Manager software did not exist as of June 30, 2010 and required significant development by KITD through 2011. Accordingly, pursuant to KITD's stated accounting policies, the TCN perpetual license fee should not have been recorded as revenue for the fiscal quarter ending June 30, 2010. As a result of this improper revenue recognition, KITD's revenue for the fiscal quarter ending June 30, 2010 was overstated by more than 5% and its pre-tax losses were understated by approximately 78%. Furthermore, the consensus estimate among analysts covering KITD's stock was that KITD would earn $22.2 million in revenues in the fiscal quarter ending June 30, 2010. With the revenue from the TCN perpetual license, KITD was able to exceed analysts' revenue estimates. Without the revenue from the TCN

perpetual license, KITD would have missed analysts' revenue estimates.

25. ROBIN SMYTH, the defendant, CC-1, and a co-conspirator not named as a defendant herein ("CC-2") trumpeted the TCN deal to the investing public. For example, on or about August 16, 2010, SMYTH, CC-1, and CC-2 participated in an earnings conference call with securities analysts and investors. During the conference call, CC-2 highlighted TCN's contract to purchase VX Manager (a contract that, in reality, did not exist as of June 30, 2010) as one of KITD's operational "wins" for the fiscal quarter ending June 30, 2010. The same day, KITD issued a press release touting the TCN contract in a similar manner, calling it a "select client win."

26. Contrary to its promises to TCN that KITD had the capability to develop VX Manager, KITD immediately encountered technological and other problems that imperiled the VX Manager deployment. By in or about December 2010, CC-1 was informed by Employee-1 and others that TCN was extremely dissatisfied with the pace of the VX Manager development and that TCN had "no confidence in [KITD's] ability to deliver ANY software functionality." After detailed internal discussions about KITD's chronic delivery failures, CC-1 and others decided that KITD would cease developing VX Manager for TCN and that, instead, KITD would provide TCN with an alternative, less-